IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

COMPASS AIRLINES, LLC                         CV 12-105-H-CCL

     Plaintiff,

-v-

MONTANA DEPARTMENT OF                         OPINION & ORDER
LABOR AND INDUSTRY,
HEARINGS BUREAU,

     Defendant,

and

DUSTIN HANKINSON,

     Intervenor.

*******

Before the Court are cross-motions for summary judgment (ECF Nos. 33

and 36), Intervenor's Motion to Dismiss (ECF No. 28) and Motion for

Reconsideration (ECF No. 50). The motions came on regularly for hearing on

June 18, 2013.  Plaintiff was represented by Mr. Jeffrey Ellis, and Intervenor was represented by Mr. Brian J. Miller.  Defendant Montana administrative agency has chosen not to participate in this proceeding.

In this case, the primary issue to be decided by the Court is whether federal law preempts the state law underlying Intervenor Hankinson's complaint against Compass Airlines, as currently presented to the Montana Department of Labor and Industry.  The parties now seek final decision on Plaintiff Compass Airlines' declaratory judgment request.  The Court will address the Intervenor's Motion for Reconsideration first because it requires consideration of the most current arguments of the parties in light of recent Ninth Circuit case law.  These considerations will have the added benefit of focusing the arguments on the cross-motions for summary judgment and the motion to dismiss.

I.    Factual and Procedural Background.

This declaratory judgment action brought by Plaintiff Compass Airlines, LLC ("Compass Airlines" or "Compass"), seeks the Court's declaration that the Air Carrier Access Act of 1986 ("ACAA"), 49 U.S.C. § 41705, has preempted the

field of law raised by Intervenor's underlying claims and, in addition, has displaced all state law remedies available to Intervenor. On December 27, 2012, this Court granted Plaintiff's Motion for Preliminary Injunction (after granting the prior motion for temporary restraining order on December 13, 2012). The Court found that Plaintiff had clearly demonstrated a likelihood of success on the merits, a threat of imminent and irreparable harm, the balance of equities tipping in its favor, and a furtherance of the public interest, all in support of the granting of a preliminary injunction.

The Intervenor in this action, is Mr. Dustin Hankinson ("Intervenor" or "Hankinson"). The facts are not in dispute, and the Court accepts the facts alleged by Intervenor and all inferences therefrom.[1]  Mr. Hankinson was scheduled to fly

---

[1] One fact that has not been disputed but could be material to any trial of the facts is whether or not Mr. Hankinson arrived late at the gate after the other passengers had been boarded. *(See* ECF No. 37-2, Intervenor's Statement of Facts, Exhibit B at 35 ("Hankinson . . . did not arrive at the gate until 5:15 am" for the flight.).)  However, Compass Airlines has asserted that a security video showed that Hankinson arrived at the departure gate five minutes before Flight 5820 was to depart. (ECF No. 37-4, Ex. D at 2.) This fact could become relevant in any trial of Mr. Hankinson's state law claims because of the federal regulation

out of Missoula, Montana, on October 4, 2011, on Flight 5820,[2] to receive an

award in Washington, D.C. for disability advocacy, when a Compass Airlines

flight attendant challenged his qualification to fly on the aircraft.  The situation

was  exacerbated by the fact that Mr. Hankinson was late arriving to the gate, after

all other passengers had boarded the aircraft.  Mr. Hankinson has Duchenne

Muscular Dystrophy, and he uses a portable ventilator and a power wheelchair.

The flight attendant, who believed that Hankinson was required to present a

medical certificate before he could bring a portable oxygen concentrator ("POC")

device on the flight, never actually spoke to Hankinson but instead directed the

_____

providing that reasonable efforts to board a *late-arriving* disabled passenger
should be made *unless* doing so would delay the flight.  *See* 14 C.F.R. § 382.27(g).
Numerous witness statements indicate that the flight crew was concerned about a
flight delay and the incident complained of took place at about the time the aircraft
door was being closed.  (ECF No. 37-2 at 35-36, 38.)  The Court notes that the air
carrier did not raise this defense during the DOT administrative enforcement
action, but possibly it could have done so had it wished to defend itself.  This issue
is not relevant to the Court's decision today *except* insofar as it highlights the
difficulty of importing an air carrier's admissions to the DOT and the DOT's
conclusions into a state agency adjudication.

  [2] Compass Airlines was the operating carrier for Delta Airlines for Flight
5820 (Missoula-Minneapolis/St/ Paul).

gate agent to tell Hankinson that he could not board Flight 5820.  The aircraft door

was shut, and the gate agent denied Hankinson permission to board the aircraft.

The flight attendant was in error, however, because Hankinson was only

bringing a ventilator, not a POC, on the flight, and he had cleared the use of this

device with Delta in advance of the flight.[3]   United States Department of

Transportation ("DOT") regulations did not require Hankinson to present a

medical certificate or doctor's letter of approval for the flight.  After Hankinson

was denied boarding by the flight attendant, the gate agent called the Conflict

Resolution Officer ("CRO")[4] to come to the gate to help Hankinson resolve this

denial of service.  The CRO spoke directly with the pilot, and the CRO

---

[3]  The Compass Airlines Manual states that ventilators and respirators are accepted for use on flights as long as they are approved in advance of the flight. Mr. Hankinson's ventilator was approved in advance of the flight.

[4]  Each air carrier is required to designate one or more employees as a conflict resolution officer.  14 C.F.R. § 382.151(a).  "The CRO is intended to be the carrier's 'expert' in compliance with the requirements of [Part 382]."  14 C.F.R. § 382.141(d).  A CRO must have "authority to make dispositive resolution of complaints [by disabled passengers] on behalf of the carrier."  14 C.F.R. § 382.141(e).  The only employee that a CRO cannot overrule is a pilot--on a safety issue.  14 C.F.R. § 382.141(e).

recommended that the pilot reverse the flight attendant's decision and allow

Hankinson to board the craft.  (ECF No. 37-2, Exhibit B, at 15.)  The pilot agreed

to do so.  Hankinson was told that the pilot would open the aircraft door and

permit him to board the aircraft.  By this time, however, Hankinson, who was

flying to Washington, D.C., to accept an award for his disability advocacy, did not

wish to board the aircraft, allegedly due to what he perceived to be a hostile

environment.[5] (ECF No. 37-2, Exhibit B, at 33.)  Hankinson therefore declined to

board Flight 5820 and instead left the airport and went home.  Both Hankinson

and his traveling companion received refunds for their tickets.

Later that day or the next, Hankinson filed a complaint with DOT.  Pursuant

to the ACAA and its implementing regulations, the DOT immediately began its

mandatory investigation of Compass Airlines' alleged refusal to transport

Hankinson.  *See* 49 U.S.C. § 41705(c)(1).  DOT's first action was to refer the

---

[5] In response to the Court's question during oral argument, Hankinson's
counsel stated that Hankinson would probably have an accepted an apology (had
one been offered) and then boarded the aircraft.

complaint to Delta Airlines, which began an investigation while simultaneously referring the complaint to its partner, Compass Airlines.

Delta informed Compass Airlines that under DOT guidelines it had roughly seven days to complete its investigation (until October 13, 2011). Delta demanded from Compass all relevant employee statements on DOT forms and all Compass reports. Compass Airlines then conducted its own internal investigation, which was completed by October 10, 2011, six days after the incident.

During the October 4 flight to Minneapolis/St. Paul, the two flight attendants and the captain were notified by Compass managers to report immediately to their respective supervisors upon landing. The first flight attendant insisted that she had rightfully denied boarding to Hankinson because he had an unapproved POC medical device and no medical waiver. She admitted that she did not check her flight manual or request a CRO's assistance (both of which were required by the Compass Airlines Flight Attendant Manual). The other flight attendant did not have any contact with Mr. Hankinson at all, and he never questioned the female flight attendant who made the boarding decision, nor did he

check his flight attendant's manual.  (ECF No. 37-2, Exhibit B, at 51.)  The captain informed his supervisor that he had relied on the female flight attendant's assertion that a medical waiver was required for Hankinson's boarding, but obviously he reversed that decision at the urging of the CRO.  (ECF No. 37-2, Exhibit B at 52.)

Both flight attendants were suspended immediately after giving their statements, and both were fired seven days later, on October 11, 2011.  The captain was temporarily suspended pending the investigation, and he was ultimately given a seven-day suspension without pay for lack of leadership.  He was subsequently provided with additional training regarding passengers with disability.  The first officer also received the additional training regarding treatment of passengers with disabilities.  (ECF No. 37-2, Exhibit B, at 53.)

DOT sent Delta a letter two days after the incident that gave Delta 30 days to respond directly to Hankinson in writing, requiring Delta to address the following matters:   (1) the facts alleged by Hankinson, (2) whether or not ("admit or deny") a violation of regulation had occurred, and (3) any mitigating or

explanatory information.  It is mandatory that the carrier address these topics

under the ACAA's implementing regulations.  *See* 14 C.F.R. § 382.155.  DOT also

demanded a copy of all correspondence sent and received by the carrier related to

the October 4, 2011, incident.  Citing 14 C.F.R. § 382.155, the DOT instructed

Delta to include in its letter to Hankinson

> whether or not the carrier believes that the complaint constitutes a
> violation of the regulation.  If the carrier agrees that a violation has
> occurred, the carrier must state what corrective action has been taken.
> . . . The failure to provide a dispositive response as required by
> §382.155 could itself lead to enforcement action.

(ECF No. 37-2, Exhibit B at 10.)

In accordance with one of the ACAA's implementing regulations, 14 C.F.R.

14 C.F.R. § 3582.19(d), the CRO sent a "ten-day letter" to Hankinson, explaining

in writing the carrier's reason for the refusal to provide air travel.  In that letter,

the CRO admitted that a violation of the federal regulations under the ACAA had

occurred.  (ECF No. 37-2, Exhibit B at 15-16.)

In its official response letter to Hankinson, Delta apologized for both its and

Compass Airlines' errors and also for Compass's initial refusal to allow

Hankinson to board Flight 5820.  (ECF No. 37-2, Exhibit B at 12-13.)  Both Delta

and Compass Airlines admitted that the initial refusal of air transportation was erroneous and that a violation of 14 C.F.R. Part 382 had occurred. Delta's letters to Hankinson informed him that the following corrective measures had been or soon would be taken: the flight attendants and the captain had been suspended and an investigation had been initiated; the captain and first officer would receive additional training on passengers with disabilities; all Compass flight attendants would receive additional training on passengers with disabilities and assistive medical equipment; all new hires and future classes would receive specific training on passengers with disabilities; and the manuals for both flight attendants and also for pilots would state that no passenger would be denied boarding without the captain of the aircraft having direct consultation with a CRO. (ECF No. 37-2, Exhibit B at 15.)

Through the two-month period of DOT's investigation, Compass Airlines participated actively by transmitting all of its reports and employee statements to Delta (which in turn was required to send all of Compass's correspondence, reports, and employee statements to the DOT).

The DOT investigation was completed within less than 60 days. By letter

dated December 9, 2011, DOT found that

-- Compass Airlines violated 14 C.F.R. § 382.23(a)[6] by requiring Hankinson to present a medical certificate prior to boarding,

-- that Compass Airlines violated 14 C.F.R. § 382.141(a)(1)(i)-(ii)[7] by failing to train the flight crew to proficiency in acceptance of ventilators on its flights, in proper procedures for resolving disputes about medical devices, and in the requirements of the Air Carrier Access Act and its implementing regulation, 14 C.F.R. Part 382, and

---

[6] "Except as provided in this section, you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 C.F.R. § 382.23(a). "You may require a medical certificate for a passenger with a disability who needs medical oxygen during a flight." 14 C.F.R. § 382.23(b)(1)(ii).

[7] "As a carrier that operates aircraft with 19 or more passenger seats, you must provide training, meeting the requirements of this paragraph, for all personnel who deal with the traveling public, as appropriate to the duties of each employee:
(1) You must ensure training to proficiency concerning:
(i) The requirements of this part and other applicable Federal regulations affecting the provision of air travel to passengers with a disability;
(ii) Your procedures, consistent with this part, concerning the provision of air travel to passengers with a disability, including the proper and safe operation of any equipment used to accommodate passengers with a disability;
14 C.F.R. 382.141(a)(1)(i),(ii).

--   that Delta Air Lines violated 14 C.F.R. § 382.41(c)[8] by providing Hankinson with erroneous information.

(ECF No. 37-2, Exhibit B at 3-8.)  DOT found further that Compass denied

Hankinson's right to equal access to air transportation.  (ECF No. 37-2, Exhibit B

at 4.)  DOT informed Hankinson that it could not provide him with  monetary

compensation.

DOT's letter to Hankinson explains that the DOT does not necessarily take

a formal enforcement action against a carrier (citing the availability of resources),

unless a violation is particularly egregious or numerous complaints indicate a

---

[8] "As a carrier, you must provide the following information, on request, to qualified individuals with a disability or persons making inquiries on their behalf concerning the accessibility of the aircraft expected to make a particular flight. The information you provide must be specific to the aircraft you expect to use for the flight unless it is unfeasible for you to do so (*e.g.*, because unpredictable circumstances such as weather or a mechanical problem require substitution of another aircraft that could affect the location or availability of an accommodation). The required information is . . .

(c) Any aircraft-related, service-related or other limitations on the ability to accommodate passengers with a disability, including limitations on the availability of level-entry boarding to the aircraft at any airport involved with the flight.  You must provide this information to any passenger who states that he or she uses a wheelchair for boarding, even if the passenger does not explicitly request the information."
14 C.F.R. 382.41(c).

pattern or practice of discrimination.  (ECF No. 37-2, Exhibit B, at 1.)  DOT noted

that it would take Hankinson's complaint into account in the event that any future

complaints were to be filed against Compass Airlines and that his testimony might

be needed at a future hearing, which might then lead to a cease-and-desist order or

to the assessment of civil penalties ($27,500 per violation) against the carrier.  The

two air carriers, Delta Airlines and Compass Airlines, were sent copies of the

DOT's letter to Hankinson, and in this fashion they were formally warned of the

possibility of these further sanctions if additional similar complaints were received

by the DOT.  (ECF No. 37-2, Exhibit B, at 4, 6, 8.)

As stated above, one of Compass's corrective actions taken was to terminate

the employment of both of the flight attendants.  In addition, Compass Airlines

hired the Metropolitan Center for Independent Living to assist it in creating a

training video and materials on the topic of passengers with disabilities to be

presented to its remaining 417 flight attendants in a special training event.  Shortly

thereafter, the training video was presented to all Compass pilots during their

annual training program.  (ECF No. 37-3, Exhibit C, at  2.)  All new hires will

receive this training also.  Compass also issued a bulletin to update pilot and flight

attendant manuals, instructing that no passenger could be denied boarding or removed from a flight in the future without the captain of the aircraft having direct consultation with either the CRO or the chief pilot. (ECF No. 37-2, Exhibit B, at 15.)

After receiving a copy of DOT's disposition letter and warnings to Delta and Compass Airlines, Hankinson filed a charge of discrimination against Compass Airlines with the Montana Human Rights Bureau, alleging a violation of the Montana Human Rights Act. (ECF No. 37-1, Exhibit A.) This charge of discrimination is based solely on the October 4, 2011, incident at the Missoula airport when Hankinson was refused air travel by Compass Airlines. Hankinson claimed that he was discriminated against by the "refus[al], with[holding], or den[ia;] . . . [of] their services . . . and creat[ion of] a hostile environment because of my physical disability (Duchenne Muscular Dystrophy)." (ECF No. 37-1, Exhibit A, at 1.)

After a finding was made that there was reasonable cause to believe that

unlawful discrimination occurred,[9] the Hearings Bureau of the Montana

Department of Labor and Industry set down a hearing on Hankinson's complaint.

In response, Compass Airlines filed this federal case seeking a declaratory

judgment that the Air Carrier Access Act and implementing regulations preempt

all of Hankinson's claims and preclude the Montana Department of Labor and

Industry from exercising jurisdiction over Hankinson's complaint.  (ECF No. 1.)

Compass Airlines asserts that if any further remedial action is required, it is the

DOT which is authorized by federal law to take action.  (ECF No. 1, at 2, ¶ 3.)

Compass Airlines subsequently filed a motion for temporary restraining

order, which this Court granted.  (ECF No. 12.)  Following hearing, on December

27, 2012, the Court granted Compass Airlines' motion for preliminary injunction.

(ECF No. 27).  Intervenor has filed three separate motions (two dispositive):  a

*Younger v. Harris* abstention motion to dismiss; a summary judgment motion; and

---

[9] This finding was made after an investigation by the Idaho Commission on
Human Rights.  (*See* ECF No. 37-4, Exhibit D, at 4.)  The Montana agency case
was transferred to Idaho due to a conflict of interest of the Montana Human Rights
Commission, Mr. Hankinson being a Commissioner at that time.  The case was
subsequently returned to the Montana agency for adjudication.

a motion for reconsideration of the preliminary injunction. Plaintiff Compass Airlines has also filed a motion for summary judgment. After addressing the legal standards applicable to the pending motions, the Court will discuss the motion for reconsideration first, for it will focus the parties' arguments as to the dispositive motions.

II.    Legal Standard for Motion for Reconsideration,
       Motion to Dismiss, and
       Motion for Summary Judgment.

A. Intervenor's Motion for Reconsideration of Preliminary Injunction

Order (ECF No. 27).

Requests for reconsideration of interlocutory orders are not addressed by the Federal Rules of Civil Procedure. However, the Local Rules of this Court, permit reconsideration of "any interlocutory order" on a ground set forth in L.R. 7.3(b)(1) or (2). L.R. 7.3(a). The pertinent provisions state that "[a] motion for . . . reconsideration . . . must specifically meet at least one of the following two criteria:

(1)    (A)    the facts or applicable law are materially different from the facts or applicable law that the parties presented to the Court before entry of the order for which reconsideration is sought,

and

 (B) despite the exercise of reasonable diligence, the party applying for reconsideration did not know such fact or law before entry of the order; or

(2) new material facts emerged or a change of law occurred after entry of the order.

L.R. 7.3(b)(1)-(2).

 B. Intervenor's Motion to Dismiss Plaintiff Compass Airlines' Complaint.

 Intervenor's Motion to Dismiss is grounded in Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction) and Fed. R. Civ. P. 12(b)(6) (failure to state a claim), both pursuant to *Younger v. Harris*, 401 U.S. 37, 27 Ed.2d 669, 91 S.Ct. 746 (1971).

 Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for motions to dismiss for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). "When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Tosco Corp. v. Communities for a Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001) (abrogated on other grounds by *Hertz Corp. v. Friend*, 599 U.S. 77, 130 S.Ct. 1181, 1186, 175 L.Ed.2d 1029 (2010)). In a facial attack on the allegations

invoking federal jurisdiction contained in the complaint, the movant asserts that the jurisdictional allegations are insufficient on their face. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for motions to dismiss for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true the allegations of the complaint in question, *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and construe the pleading in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Meek v. County of Riverside,* 183 F.3d 962, 965 (9th Cir.1999).

A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters

properly subject to judicial notice." *Outdoor Media Group, Inc. v. City of Beaumont,* 506 F.3d 895, 899 (9th Cir.2007) (citation and quotation marks omitted).

C. Cross-Motions for Summary Judgment.

A court should grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A shifting burden of proof governs motions for summary judgment under Rule 56. *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),* 627 F.3d 376, 387 (9th Cir.2010). If the moving party meets its initial responsibility, the opposing party must establish that a genuine dispute as to any material fact actually does exist. *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89
L.Ed.2d 538 (1986).

In resolving a motion for summary judgment, the evidence of the opposing
party is to be believed. *See Anderson,* 477 U.S. at 255. Moreover, all reasonable
inferences that may be drawn from the facts placed before the court must be
viewed in a light most favorable to the opposing party. *See Matsushita,* 475 U.S. at
587; *In re Oracle Corp. Sec. Litig.,* 627 F.3d at 387. "Where the record taken as a
whole could not lead a rational trier of fact to find for the nonmoving party, there
is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (citation omitted).

III.    Motion to Reconsider Preliminary Injunction Order.

Intervenor Hankinson seeks the Court's reconsideration of its December 27,
2012, Order (ECF No. 27) granting Plaintiff Compass Airlines a preliminary
injunction against the Montana Department of Labor and Industry, Hearings
Bureau.  Intervenor asks that the Court reevaluate the injunction in light of recent
Ninth Circuit case law.  The Court begins by reviewing the law generally
pertaining to Compass Airlines' complaint, which is the Air Carrier Access Act of
1986 ("ACAA"), Pub. L. No. 99-435, 100 Stat. 1080, and its implementing

regulations (Part 382 of Title 14 of the Code of Federal Regulations).

A.    Implied Preemption of
      Safety Regulations
      Under Federal Aviation Act

In this case, the relevant Part 382 regulations that were violated by Compass

Airlines and Delta Air Lines are indeed intended by the DOT to function in part as

safety regulations:

1. Compass admitted violating § 382.23(a), which provides:

(a) Except as provided in this section, you must not require a

passenger with a disability to have a medical certificate as a condition

for being provided transportation.")

(b)(1)  You may require a medical certificate for a passenger with a

disability–

(i) Who is traveling in a stretcher or incubator;

(ii) Who needs medical oxygen during flight; or

(iii) Whose medical condition is such that there is reasonable

doubt that the individual can complete the flight safely, without

requiring extraordinary medical assistance during the flight."

14 C.F.R. § 382.23.  Not only may an air carrier require a medical certificate of some passengers, the air carrier may further require such passengers to "undergo additional medical review by [the air carrier]" under several circumstances, one of which is the belief that the passenger "would pose a direct threat to the health or safety of other persons on the flight."  14 C.F.R. § 382.23(d).  Thus, this ACAA regulation also functions as a safety regulation because it addresses when a medical certificate may be required of a passenger for safety reasons (ensuring both the safety of the disabled passenger and the safety of other passengers and aircraft crew).

      2.     Compass Airlines admitted violating § 382.141, which provides:

> (a)  As a carrier that operates aircraft with 19 or more passenger seats, you must provide training, meeting the requirements of this paragraph, for all personnel who deal with the traveling public as appropriate to the duties of each employee.
> (1)  You must ensure training to proficiency concerning:
>   (i)  The requirements of this part and other applicable Federal regulations affecting the provision of air travel to passengers with a disability.
>   (ii)  Your procedures, consistent with this part, concerning the provision of air travel to passengers with a disability, *including the proper and safe operation of any equipment* used to accommodate passengers with a disability; and
>   (iii)  For those personnel involved in providing boarding and

deplaning assistance, the use of the boarding and deplaning assistance equipment used by the carrier and appropriate boarding and deplaning assistance procedures *that safeguard the safety and dignity of passengers*.

14 C.F.R. § 382.141(a)(1) (emphasis added). This ACAA regulation also functions as a safety regulation, because it addresses the need for air carrier personnel to be trained in the safe operation of medical assistive devices and in safe boarding and deplaning assistance procedures to be provided to disabled passengers and the use of special equipment therefor.

Both portable oxygen concentrators and ventilators are portable electronic devices that must be tested and labeled by manufacturers for acceptable levels of emissions of radio frequency interference. (ECF No. 37-3, Exhibit C, at 8-9.) Both devices are governed by FAA regulation. (*Id.* (citing Advisory Circular 91.21-1, Use of Portable Electronic Devices Aboard Aircraft)). The use of ventilators and portable oxygen concentrators aboard aircraft is both an issue of rights and, at the same time, a safety issue; regulation § 382.141 likewise addresses the training of air carrier personnel for the purpose promoting equal rights of disabled passengers while at the same time maintaining aircraft safety.

3.  Delta Air Lines violated § 382.41, which provides:

> As a carrier, you must provide the following information, on request, to qualified individuals with a disability or persons making inquiries on their behalf concerning the accessibility of the aircraft expected to make a particular flight.  The information you provide must be specific to the aircraft you expect to use for the flight unless it is unfeasible for you to do so. . . .

14 C.F.R. § 382.41.[10]  The information required is (a) location of seats with movable armrests, (b) location of seats not available to disabled passengers (*e.g.,* exit rows) due to safety concerns, (c) aircraft limitations, such as lack of level-entry boarding, (d) cabin limitations for storage of wheelchairs, (e) accessibility of lavatories, (f) availability of services on the flight.  14 C.F.R. § 382.41(a)-(f).  All of the required information either directly or indirectly implicates one or more safety issues:  whether a ramp or lift will be required for entry into the aircraft, safe transfer from an aisle chair to a cabin seat, storage of assistive devices in the cabin, availability of safe lavatories and other services during the flight (such as

---

[10]  Delta Air Lines provided the correct preflight information to Hankinson, but what actually transpired did not match Delta's preflight information.  The DOT therefore concluded that a violation of ACAA regulation § 382.41 had occurred.

not serving peanuts on the flight if so requested by an allergic passenger, *see* 73

Fed. Reg. 27614, 27650 (May 13, 2008)). This regulation requiring the provision

of preflight information to disabled passengers is designed generally to protect the

rights of disabled passengers to be informed prior to embarking on a flight, but it

also requires that air carriers specifically provide substantive information about

the air carrier's procedures for solving common safety problems encountered by

disabled passengers.

The Court notes that, in this case, particularly focusing as it does on the

regulations relating to electronic respiratory assistive devices, all respiratory

assistive devices must be tested by RTCA, Inc. (formerly the Radio Technical

Commission for Aeronautics) for the level of emissions of radio frequency

interference and be properly labeled before they can be approved by the Federal

Aviation Administration and accepted on flights by air carriers. (ECF No. 37-3,

Exhibit C, at 8-9.) In other words, it is permissible for an air carrier to deny

boarding to a disabled passenger bringing an unapproved assistive device onto the

aircraft because there are important safety issues involved with these devices. To

dismiss Part 382 regulations as being primarily non-safety oriented seems an

inaccurate assessment of the purpose of the regulations, many of which place significant limitations on the rights of passengers with disabilities for the express purpose of maintaining safe operation of aircraft and safe air travel for all passengers. Therefore, it seems to the Court that, given that the ACCA is an amendment to the Federal Aviation Act of 1958 ("FAA"), Pub. L. No. 85-726, 72 Stat. 731, and given that the Part 382 regulations at issue *in this case* are clearly safety-oriented, these regulations should and do preempt state laws pursuant to the implied preemption for aviation safety regulations. *See Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) ("the FAA preempts the entire field of aviation safety from state and territorial regulation....").

The ACAA and its implementing regulations at issue in this case are not fairly categorized as being *solely* non-discrimination regulations, because it is reasonably clear that they can be categorized also as safety regulations, in that they are intended to protect not just the rights, but also the safety of both disabled and non-disabled passengers. Because the state law claim in this case implicates an area pervasively regulated by the DOT (*i.e.*, the medical certificate boarding requirement for a disabled passenger using a medical assistive device, and the

provision of information relating thereto), the implied preemption in the area of air transportation safety is appropriately applied here and precludes state law claims for violation of these particular ACAA regulations.

Intervenor Hankinson requests that this Court reconsider its preliminary injunction order based upon the Ninth Circuit's recent decision in *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995 (9th Cir. 2013), which is, of course, recent case law that is binding precedent.[11]  Plaintiff Gilstrap, a disabled passenger, suffered physical injury due to the failure of the air carrier to provide her with a wheelchair to assist her in moving through multiple airports.  Gilstrap asserted California state-law causes of action against the air carrier, including negligence, negligent misrepresentation, breach of duty of a common carrier, intentional infliction of emotional distress, and negligent infliction of emotional distress,

---

[11]  At the time the Court entered the temporary restraining order, the Court was aware of but did not cite the district court opinion in *Gilstrap v. United Air Lines, Inc.*, 2011 WL 8318395 (C.D. Cal. 2011).  The Court mentioned the *Gilstrap* district court decision in its preliminary injunction order, but did not rely upon it.  (ECF No. 27 at 11, 15.)  Of course, the Circuit Court's *Gilstrap* opinion is binding on this Court, which is obligated to follow it if this case falls within its scope.

using the ACAA as evidence of the standard of care.

The Part 382 regulations that were allegedly violated in *Gilstrap* were those governing provision of assistance to passengers with disability in moving through the airport, enplaning and deplaning, and in obtaining the use of motorized carts, wheelchairs, ramps and lifts. *See* 14 C.F.R. §§ 382.91 and 382.95. As a result of these violations, the plaintiff suffered severe pain requiring medical treatment (an epidural injection).

Relying on *Elassad v. Independence Air, Inc.*, 613 F.3d 119, 131-32 (3rd Cir. 2010) (a bodily injury/aircraft stairway case where no federal regulation was directly implicated) and *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3rd Cir. 1999) (bodily injury due to lack of warning regarding flight turbulence), the *Gilstrap* decision concluded that state remedies were available to the plaintiff, citing *Abdullah v. American Airlines*, 181 F.3d 363 (3d Cir. 1999), for its conclusion that a state law remedy may be available for violation of FAA regulations by an air carrier.

In *Abdullah*, the plaintiffs suffered bodily injury during an American Airlines flight that experienced severely turbulent weather. The plaintiffs' state

claims alleged the air carrier was negligent in failing to avoid the turbulence and also in failing to warn the passengers of the approaching turbulent conditions. A jury awarded the plaintiffs over two million dollars in damages for their serious injuries. Following post-trial motions, the district court certified a question to the Third Circuit seeking instruction as to whether federal law preempts standards for air safety but preserves state damages remedies. The Third Circuit in *Abdullah* answered affirmatively. First, the Third Circuit held that the FAA impliedly preempts the entire field of aviation. *Abdullah*, 181 F.3d at 367 (regulations "establish complete and thorough safety standards for interstate and international air transportation that are not subject to supplementation by, or variation among, jurisdictions."). In finding that state remedies are still available for violations of the federal standards, however, the *Abdullah* decision relied upon the FAA's Savings Clause[12] (noting that whatever state remedies that were available before

---

[12]   49 U.S.C. § 40120(c). The Savings Clause provides that "[a] remedy under this part [49 USCS §§ 40101 et seq.] is in addition to any other remedies provided by law."

passage of the FAA were still available after passage) and the Insurance Clause.[13]

Once again, although acknowledging that the federal standards preempt state

standards, the *Abdullah* decision rests, finally, on the fact that Congress elected to

*require* air carriers to carry insurance for bodily injuries, death, and property loss.

This defines the limit of the exception to the FAA's implied preemption--

Congress required that the damages sought to be remedied are for bodily injury,

death, and property loss. *Gilstrap* thus adopts the *Abdullah* preemption exception

for state law claims for damages for bodily injury, death, and property loss

predicated upon violation of the federal regulatory standard.

*Abdullah* was a case involving serious bodily injury in an area of aviation

safety that was pervasively regulated. Indeed, *Abdullah* relied on the Insurance

Clause of the FAA to determine that "Congress intended to allow for

---

[13] The FAA specifically requires air carriers to carry insurance "for bodily injury to, or death of, an individual or for loss of, or damage to, property of others, resulting from the operation or maintenance of the aircraft under the certificate [to provide air transportation]." 49 U.S.C. § 41112(a). Because the FAA contains no private right of action for tort claims, "this clause can only contemplate tort suits brought under state law." *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 808 (9th Cir. 2009); *see also Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 375 (3rd Cir. 1999).

compensation of persons who were injured in aviation mishaps." *Abdulllah*, 181 F.3d at 375. *Abdullah* announces that "[w]e must conclude, therefore, that the insurance proceeds are to be available as a remedy under state or territorial law." *Id.* at 376. Likewise, and following *Abdullah*, *Gilstrap* concludes that a state remedy is available for a violation of the ACAA even in an area of pervasive regulation (only the state standard of care being preempted) and that state claims of infliction of emotional distress should not be preempted at all because ACAA regulations do not govern "*how* airline agents should interact with passengers." *Gilstrap*, 709 F.3d at 1008. However, the *Gilstrap* decision found that the ACAA regulations were not a critical element of Gilstrap's emotional distress claims, which were based on behavior such as ground crew yelling at the plaintiff for not standing in line as they told her to do. *Id.* at 1009 (distinguishing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), and noting the tort claim in *Buckman* "was uniquely dependent on the federal regulatory scheme").

   The instant case is factually distinguishable on this point, because Hankinson's hostile environment claim is fundamentally based on alleged

violations of the ACAA in that he was stopped from boarding because he was not carrying a medical certificate and because he was allegedly carrying a portable oxygen concentrator that had not been cleared with the airline in advance of the flight. The Court rejects Hankinson's view that his hostile environment claim is not connected to any ACAA regulation. The allegation of hostile environment is dependent upon and arises both chronologically and logically from the ACAA violations themselves.

To sum up, in at least one crucial respect, the instant case is distinguishable from either *Abdullah*, *Elassad*, or *Gilstrap*: in this case there is no claim of bodily injury, and therefore the Insurance Clause does not justify making that exception to complete field preemption. Furthermore, the Court finds that the DOT has provided detailed advice to air carriers to interpret the regulations of Part 382 to safeguard the dignity of disabled passengers and to guide air carriers' interactions with disabled passengers. *See*, *Nondiscrimination on the Basis of Disability*, 70 Fed. Reg. 41482, 414504-06 (July 19, 2005) (*e.g.*, "[a]lways make eye contact and speak directly to a person with a disability, not the person's companion, attendant,

or interpreter.").[14] In addition, in this case, unlike in *Gilstrap*, any state claims of

infliction of emotional distress are not separate from but intertwined with the

preempted claims and would therefore require a trial of the alleged violations of

the ACAA regulations themselves.[15] Thus, there is an implied preemption, the

---

[14] This document contains a Technical Assistance Manual for air carriers to use in training employees to prepare them for interactions with disabled passengers. The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21; Public Law 106-181), enacted on April 5, 2000, required the DOT to provide a Technical Assistance Manual to air carriers regarding the ACAA and Part 382 regulations. Training topics addressed include sensitivity, awareness, and communications with people with disabilities.

[15] Thus far, the only Montana cause of action for "hostile environment" has been recognized in the employment context. *See Saucier v. McDonald's Rest. of Mont., Inc.*, 179 P.3d 481 (Mont. 2008); *Stringer-Altmaier v. Haffner*, 138 P.3d 419 (Mont. 2006) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 62, 106 S.Ct. 2399, 2403, 91 L.Ed.2d 49 (1986)). To present such a claim in the employment context, the plaintiff must show "sufficiently severe or pervasive" actions that "create an abusive working environment." *Stringer-Altmaier*, 138 P.3d at 424. An employer may be held vicariously liable for acts of discrimination in the workplace when the employer fails "to seriously and adequately investigate and discipline [the harasser] . . . and [fails] to protect [the victim] on the job." *Id.* (quoting *Benjamin v. Anderson*, 112 P.3d 1039, 1049 (Mont. 2005)). To the extent that Hankinson could amend his MHRB complaint to present claims of intentional or negligent infliction of emotional distress, he would be required to prove that he suffered such distress "so severe that no reasonable man could be expected to endure it." *Czajkowski v.Meyers*, 172 P.3d 94, 101 (Mont. 2007) (intentional infliction of emotional distress case) (quoting 1965 Restatement (Second) of Torts § 46 cmt j). Negligent infliction of emotional distress occurs

Insurance Clause does not provide the exception to preemption, and the state

claims at issue are factually predicated upon federal regulatory violations.

B.    Express Preemption Pursuant to
      Airline Deregulation Act of 1978

To the extent that the ACAA regulations ought to be viewed as economic as

opposed to safety regulations, the explicit preemption provided by the Airline

Deregulation Act of 1978 ("ADA"), codified at 49 U.S.C. § 41713, is implicated.

By this amendment, the FAA expressly preempts states from "enacting or

enforcing any law, rule, regulation, standard, or other provision having the force

and effect of law relating to rates, routes, or services of any air carrier . . . ."  49

U.S.C. § 41713.  The ADA preemption covers state laws that specifically regulate

airlines, indirectly regulate rates, routes or services, or have a significant effect on

rates, routes or services, even though they are state laws of general effect and not a

---

under Montana law when "serious or severe emotional distress to the plaintiff was
the reasonably foreseeable consequence of the defendant's negligent act . . . or
omission."  *Sacco v. High Country Indep. Press, Inc.*, 896 P.2d 411, 429 (1995).
*Sacco* also utilizes the definition of distress found in *Restatement (Second) of
Torts* § 46 cmt. j:  distress "so severe that no reasonable man could be expected to
endure it.").  *Id.* at 426.

law specifically addressing the airline industry, and even though the state law is consistent with substantive requirements of federal law. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 387-89, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The phrase "law, rule, regulation, order, or standard" has been construed to include state common-law claims. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)(interpreting preemption language of Federal Railroad Safety Act of 1970).

The key phrase "relating to" expresses "a broad pre-emptive purpose[,]" and deliberately so. *Id.* at 383-84. Even general state laws that have only an indirect effect on rates, routes, and services are preempted by the ADA. Common-law tort and contract suits are preempted by the "relating to" language of the preemption text. *Morales*, 504 U.S. at 386 (citing *Pilot Life v. Dedeaux*, 481 U.S. 41, 47-48, 107 S.Ct. 1549, 1552-53, 95 L.Ed.2d 39 (1987)).

In this case, a state action alleging wrongful denial of air transportation services (whether by outright denial of boarding or by creation of hostile environment) is an enforcement of a general law affecting an air carrier's services. *See In re Korean Air Lines Co., Ltd., Antitrust Litig.*, 642 F.3d 685, 697 (9th Cir.

35

2011) (noting that *Rowe* "reiterated that a state law 'having a connection with, or reference to' rates, routes, or services is preempted and that 'it makes no difference whether a state law is consistent or inconsistent with federal regulation.'"). Even the "hostile environment" claim is not too "tenuous, remote, or peripheral," to air carrier service merely "because it only addresses the manner in which [the passenger] was refused service rather than the fact that service was refused." *Onoh v. Northwest Airlines, Inc.*, 613 F.3d 596 (5th Cir. 2010) (applying *Morales* to find ADA preemption of passenger's state law IIED claim for repeated denials on separate days of right to board aircraft).

Allowing state court claims to regulate the airlines indirectly by allowing non-bodily-injury tort claims premised upon alleged regulatory violations could result in a state-by-state patchwork of outcomes that could indeed begin to interfere with competitive market forces. Ultimately, such claims could exert pressure on the rates, routes, and services of air carriers. An uneven state-by-state patchwork of state remedies for non-bodily-injury torts could significantly affect not just the price of airline tickets but the "selection of markets" by air carriers. *See Charas*, 160 F.3d at 1266 (presuming laws significantly affecting air carriers'

'selection of markets' as preempted by ADA). "That state regulatory patchwork is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Rowe*, 552 U.S. at 373.

The Court concludes that allowing state law tort claims and remedies in non-bodily injury cases, and allowing them to vary state by state, would significantly, if indirectly, affect rates, routes, and services. Therefore, the ADA's express preemption could be applied to Hankinson's complaints of denial of air transportation service and hostile environment. The fact that the subject matter of the complaint is inextricably intertwined with air carrier safety issues relating to electronic respiratory devices and passenger medical certificates only makes the case for preemption (both express and implied) stronger.

C. Conflict Preemption

The *Gilstrap* decision found no conflict in requiring an air carrier to comply with federal requirements and still pay damages in state court, and in fact this is the typical circumstance in today's aviation tort cases involving bodily injury. However, *Gilstrap* is distinguishable because there the disabled passenger did not first utilize the federal *remedy* before filing her claim pursuant to state law. In this

case, Intervenor Hankinson pursued the federal remedy before pursuing a state remedy.

Actual conflict preemption may arise "when two separate remedies are brought to bear on the same activity." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Even if the regulated entity can comply with both state and federal sanctions, the mere fact of the inconsistent sanctions can undermine the federal choice of the degree of pressure to be employed, "undermin[ing] the congressional calibration of force." *Id.* at 379-80. When a state law diminishes the value of the bargaining chip offered federally (such as the value of the regulator's approval of the air carrier's operating certificate) by the very existence of a competing state sanction (such as substantial punitive damages judgments), the state law then "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 377.

Ever since *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (holding courts may not recognize implied rights of action unless statute provides clear manifestation of congressional intent to create private

right of action), it has become doubtful whether any private right of action exists under the ACCA. The Second, Tenth, and Eleventh Circuits have ruled there is not. *See Gilstrap*, 709 F.3d at 1002 (*citing Lopez v. Jet Blue Airways*, 662 F.3d 593, 596-97 (2d Cir. 2011); *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1269-97 (10th Cir. 2004); *Love v. Delta Air Lines*, 310 F.3d 1347, 1354-59 (11th Cir. 2002)). This Court sees no manifestation of congressional intent in the text of the ACAA that would lead to a finding of a private right of action, and Intervenor Hankinson does not urge this Court to do so in any event. Moreover, the context for the enactment of the ACAA in response to *PVA v. DOT* (*viz.*, its holding that Rehabilitation Act remedies were not available to all air carriers) was that at that time the Rehabilitation Act was thought to allow compensatory damages and injunctive relief but not emotional distress damages or punitive damages. This, combined with the fact that Congress chose an administrative enforcement remedy for the ACAA, tends to make it appear that Congress did not intend that the entire spectrum of state court remedies would be available for disability discrimination claims not involving bodily injury, death, or property loss.

The ACAA *mandates* that the Secretary of the Department of Transportation

investigate each complaint presented to it *or* presented to an air carrier.  49 U.S.C.

§ 41705(c)(1).[16]  The air carriers are *required* by FAA regulation to investigate,

respond to, and report to the DOT all complaints of disability discrimination

received by the air carrier.  14 C.F.R. 382.151.  The Secretary *must* make ACAA

complaint statistics public[17] and report annually to Congress its review of all

ACAA complaints.  49 U.S.C. § 41705(c)(2)-(3).  Civil penalties are available for

each individual act of discrimination.  49 U.S.C. § 46301(a).  In addition, the DOT

can provide equitable remedies such as injunctive relief and declaratory relief.  49

U.S.C. § 46101(a)(4).  The civil penalty can be imposed only after notice and

opportunity for hearing.  49 U.S.C. § 46301(c)(6).  An order imposing a civil

penalty is subject to judicial review pursuant to section 46110.  49 U.S.C. §

46301(g).  Section 46110 provides for judicial review as follows:

---

[16]  However, the DOT need not investigate formal complaints submitted
more than six months after the incident.  14 C.F.R. § 382.159(c).

[17]  The most recent DOT Air Travel Consumer Report (July 2013) reports that the DOT
investigated 51 complaints categorized as disability complaints in May 2013 and provides the
breakdown by airline.  *See* DOT, *Air Travel Consumer Report* 39-40 (2013),
http://www.dot.gov/sites/dot.dev/files/docs/2013JulyATCR_0.pdf.  DOT monthly reports also
ranks individual airlines by the number of consumer complaints received.  *Id.* at 43.

> a person disclosing a substantial interest in an order issued by the
> Secretary of Transportation . . . or the Administrator of the Federal
> Aviation Administration . . . may apply for review of the order by
> filing a petition for review in the United States Court of Appeals for
> the District of Columbia or in the court of appeals of the United
> States for the circuit in which the person resides or has its principal
> place of business.  The petition must be filed not later than 60 days
> after the order is issued.

49 U.S.C. § 46110(a).  The court of appeals has "exclusive jurisdiction to affirm,

amend, modify, or set aside any part of the order and may order the Secretary . . .

to conduct further proceedings."  49 U.S.C. § 46110(c).  "Findings of fact by the

Secretary, Under Secretary, or Administrator, if supported by substantial evidence,

are conclusive."  49 U.S.C. § 46110(c).  A decision by the court of appeals "may

be reviewed only by the Supreme Court under section 1254 of title 28 [petitions

for writ of certiorari]."  49 U.S.C. § 46110(e).

In this case, where the facts clearly show the air carrier exhibiting

unhesitating responsiveness to the DOT's investigation and swift correction of its

regulatory violation, state law claims could present a substantial impediment to

this federal enforcement scheme.  It is doubtful whether an air carrier would

complete its investigation within seven days of incident and retrain all four

hundred plus employees within 60 days.  The air carrier is now answerable to the DOT for ACAA regulation violations, and it appears that Congress intended that this be the exclusive remedy in cases not involving breach of contract or bodily injury or death.  To permit a state remedy under the facts and circumstances of this case would diminish the value of the federal bargaining chips and also block the achievement of the industry-wide objective of non-discrimination in air travel that Congress set for itself in enacting the ACAA.

*Gilstrap* is properly distinguished on several grounds.  First, as a factual matter, Michelle Gilstrap  repeatedly requested assistance from the air carrier and received none despite her pleas.  In this case, the Compass Airlines flight crew reversed its erroneous decision not to board Mr. Hankinson within approximately 15 minutes of making it--and it was Mr. Hankinson who refused to board the aircraft.  Second, the plaintiff's state claims in *Gilstrap* were not preempted due to the Insurance Clause exception for cases involving bodily injury.  The Insurance Clause exception to preemption is inapplicable to Hankinson's claim because he has alleged no bodily injury.  Third, in light of the Ninth Circuit's narrow definition of "services" for ADA preemption purposes, see *Charas*, 1259 F.3d at

1261, the *Gilstrap* facts did not allow for an express preemption under the ADA. *See Gilstrap*, 709 F.3d at 1003 n.12. In this case, however, the ADA express preemption is certainly implicated by a claim of outright denial of transportation services. Fourth, Gilstrap did not elect to utilize the DOT's administrative enforcement remedy prior to filing her lawsuit under state law, and therefore the *Gilstrap* decision did not consider whether a plaintiff is entitled to *both* federal and state remedies. In this case, conflict preemption between the state and federal remedies does arise because Hankinson did present his claim to the DOT, which then conducted an investigation that resulted in an admission by the air carrier of violation of ACAA regulations and performance of corrective action by the air carrier that was satisfactory to the DOT. Even if a state law remedy were available to Intervenor Hankinson as a matter of law, Hankinson has already sought and obtained the federal remedy first by complaining to the DOT, which conducted its mandatory investigation and disposed of the complaint by issuing a warning to Compass Airlines. Compass Airlines is now being whipsawed with its admissions given to the DOT because Hankinson intends to use those admissions to obtain the

state law remedy.[18]  Given these numerous factual and legal grounds for distinguishing the *Gilstrap* decision, this Court concludes that the holding of *Gilstrap* does not control in this case.  Intervenor Hankinson's motion for reconsideration of the preliminary injunction order will therefore be denied.

IV.    Motion to Dismiss.

Intervenor Hankinson files a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted, citing *Younger v. Harris*, 401 U.S. 37, 27 L.Ed.2d 669, 91 S.Ct. 746 (1971).  By this motion Intervenor Hankinson requests that the Court abstain from interfering with pending state judicial proceedings, citing *Hirsh v. Justices of Supreme Court*, 67 F.3d 708, 712 (9th Cir. 1995) (applying three-part *Younger* test).  Hankinson argues that the on-going Montana Department of Labor and Industry proceedings are judicial in character, implicate important state interests, and provide Compass Airlines an

_____

[18]  Furthermore, having dismissed two key employees involved in the incident, Compass may be hampered in its ability to present whatever defenses it might otherwise have had available to it prior to administrative proceedings.

adequate opportunity to litigate federal claims, including judicial review of the state proceedings. (ECF No. 29 at 4.) Hankinson asserts that no extraordinary circumstances are present that would bar the abstention doctrine in this case, and that Compass Airlines can raise its preemption defense for consideration by the state hearings officer.

The *Younger* abstention doctrine was originally addressed to a request to enjoin state criminal proceedings. *Younger*, 401 U.S. at 45. This abstention doctrine has since been extended to administrative proceedings implicating important state interests. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 433-34, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). Abstention is appropriate if state proceedings are (1) ongoing, (2) implicate important state interest, and (3) provide an adequate opportunity to raise federal questions. *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001).

The three-part *Younger* test is not met in this case, however, because, unlike the subject of attorney discipline in *Hirsch* (which is uniquely a state function), aviation is not a significant state interest. In fact, the Montana legislature has

stated that its policy vis-a-vis aviation is to cooperate with the federal authorities

in "effecting a uniformity of the laws", to accomplish "the purposes of federal

legislation", and to eliminate "costly and unnecessary duplication of functions."

Mont. Code Ann. § 67-1-102.  Thus, Montana law has explicitly disavowed a

significant interest in aviation.  To the contrary, Montana has expressed its interest

in conforming to a uniform federal aviation regime.  Because the subject matter

does not implicate a significant state interest,[19]  the Court need not address the two

other elements of the test.  *See Gartrell Constr. v. Aubrey*, 940 F.2d 437, 441 (9th

Cir. 1991); s*ee also Champion Intl. Corp. v. Brown*, 731 F.2d 1406 (9th Cir. 1984)

(Montana has no cognizable interest in enforcing state age discrimination laws

that are federally preempted).  The Court finds that the field of aviation (unlike

that of state bar discipline) does not implicate an important Montana interest.

    Moreover, a state may choose to submit to federal adjudication, and in that

---

[19]  The Court must respectfully disagree with Hankinson's position that the
subject matter of this case is disability discrimination.  This is not a case on facts
that could have arisen anywhere in Montana except at the doorway of an aircraft
accepting commercial passengers for interstate air transportation.  It is that
essential element that, for purposes of the *Younger* test, makes the subject matter
of this case aviation, or (more precisely) disability discrimination in aviation.

case federalism and comity concerns do not arise. *See Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 480, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system."). The *Younger* challenge is presented by Hankinson, not by the Montana Department of Labor and Industry, which has chosen not to appear and defend in this case and cannot now be deemed to speak through Hankinson. (ECF No. 20, "Notice of Non-Participation.") When a state acquiesces to the federal forum, the Supreme Court has stated that a *Younger* abstention need not be addressed. *Hodory*, 431 U.S. at 480 n.10. In addition, while declining to participate in the case, the Montana Department of Labor and Industry did acknowledge the Court's temporary restraining order and, in response, stated its intent to stay its proceedings until further notice.

When the U.S. Supreme Court entertained a similar federal declaratory judgment action, it stated that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, *thus*

*presents a federal question which the federal courts have jurisdiction under 28*

*U.S.C. § 1331 to resolve. Shaw v. Delta*, 463 U.S. 85, 96 n.14 (1983) (emphasis

added) (holding that New York's Human Rights Law contradictory to federal law

was preempted insofar as it contradicted federal law). In this case, the Court finds

that its general obligation to exercise its jurisdiction, *see Walnut Props., Inc. v.*

*City of Whittier*, 861 F.2d 1102, 1106 (9th Cir. 1988), prevails over Hankinson's

jurisprudential challenge because the area in question is not an area of significant

interest to Montana and because Montana has chosen not to appear.

V.     <u>Cross-Motions for Summary Judgment.</u>

The Court finds that summary judgment is appropriate in this case because

the parties are in agreement as to the material underlying facts in this case and

mainly present a dispute as to matters of law. That said, the Court does take

exception to one legal opinion presented as "fact" presented by Intervenor

Hankinson because it does not comport with the evidence. Hankinson asserts that

"US DOT . . . informed Dustin that he could pursue a civil right of action for

damages." (ECF No. 39 at 8 [SUF, Ex. B, pg. 1]. This is not accurate. The DOT

merely informed Hankinson that

> [w]e cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

(ECF No. 37-2.) This boiler-plate statement merely begs the fundamental question. The entire point of *this* declaratory judgment action is to determine whether there is a private right of action available to Hankinson or whether any such claims are preempted by the FAA. It is not accurate to say that the DOT informed Hankinson that *"he* could pursue a civil right of action for damages." (ECF No. 39 at 8, emphasis added.)

As to Intervenor Hankinson's Motion for Summary Judgment, the Court finds that Hankinson's hostile environment claim is derivative of, predicated upon, and would actually require trial of ACAA violations. In this case, the ACAA violation is FAA field-preempted due to Intervenor's lack of any bodily injury. Alternatively, and in light of the fact that Hankinson describes his hostile environment claim as a denial of service (described as "the creation of an environment so hostile that the passenger could not have reasonably been expected to board," (ECF No. 39 at 11)), the ADA preempts state laws relating to the

services of an air carrier.

Intervenor Hankinson claims that his MHRB complaint against Compass Airlines has nothing whatever to do with the ACAA and is only a state law claim of hostile environment.[20] The Court rejects Intervenor's argument that the hostile environment claim is not predicated on the ACAA. The statutory language itself *requires* that air carriers refrain from discriminating against an "individual [who] has a physical . . . impairment that substantially limits one or more major life activities." 49 U.S.C. § 41705. ACAA regulations further provide that an air carrier "*must not exclude* a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons, except where specifically permitted by this Part." 14 C.F.R. § 382.11(a)(3) (emphasis added). ACAA regulations also provide that an air carrier "*must not take any adverse action* against an individual (*e.g.*, refusing to provide transportation) because the individual asserts, on his or her own behalf . . .

---

[20] However, Hankinson did not present a "hostile environment" claim to the DOT; he presented this claim only to the Montana Human Rights Bureau some 4 months later. This claim was never investigated as a potential violation of the ACAA by the DOT because the claim was not presented to it.

rights protected by this part or the Air Carrier Access Act." 14 C.F.R. § 382.11(a)(4) (emphasis added). The DOT easily might interpret these regulations to forbid air carriers from creating a hostile environment--indeed, it seems that this is the express purpose of the ACAA and its implementing regulations.

Had Intervenor presented his hostile environment claim to the DOT for investigation, it is quite likely that such a claim would have been found to be governed by ACAA regulations and the ACAA itself. Intervenor's flat assertion that Congress did not intend to provide in the ACAA a remedy for creation of a hostile environment--intentionally leaving such a claim for the 50 states to adjudicate--is not supported by the statute, the regulations, or the agency interpretation. There is much detailed advice and guidance issued by the DOT to inform air carriers as to appropriate personal interaction with disabled passengers, none of which would approve of the air carrier's creation of a hostile environment. *See Nondiscrimination on the Basis of Disability*, 70 Fed. Reg. 41482-01, 414504 (July 19, 2005). Certainly, any formal complaint of hostile environment by a disabled passenger to the DOT or to the air carrier itself would have been

investigated by the DOT, as is required by federal law. The ultimate point is not that Hankinson *should* have presented his hostile environment claim to the DOT, but that he *could* have presented the claim to the DOT and failed to do so.

In summary, the only reason that there is no DOT ruling on an ACAA violation related to Hankinson's "hostile environment" claim is that Hankinson never presented this claim either to the air carrier or the DOT. The "hostile environment" claim is inextricably intertwined with the ACAA regulation violations that *were* presented by Hankinson to the DOT, however, and the Court has found that all such claims are FAA field-preempted, distinguishing *Gilstrap* on the safety orientation of the ACAA regulations at issue in this case, the non-applicability of the Insurance Clause exception, the availability of ADA preemption on these facts, and the actual conflict caused by obtaining the administrative remedy before pursuing the a state law remedy. Whether or not Congress intended that there be an exclusive administrative remedy, or an administrative remedy coupled with the Insurance Clause exception, it seems highly unlikely that Congress intended that there be a third choice--a hybrid-remedy whereby a passenger could submit some of his claims for administrative

enforcement by the DOT while reserving his other, factually-related claims for subsequent adjudication by a state agency. That is the case presented today, and for the reasons stated above, the Court finds this case to be distinguishable from the *Gilstrap* decision.

The Court finds that there are no genuine material questions of fact, and Compass Airlines is entitled as a matter of law both to declaratory judgment and also to a permanent injunction against adjudication of Intervenor Hankinson's Complaint of Discrimination (No. 0121015383) filed with the Montana Human Rights Bureau on February 22, 2012.

Congress enacted the Air Carrier Access Act of 1986 to forbid discrimination against disabled passengers by air carriers. The Department of Transportation, which was tasked by Congress with the implementation of the ACAA, completed its final rulemaking in 1990. *See Nondiscrimination on the Basis of Handicap in Air Travel*, 55 Fed. Reg. 8008 (Mar. 6, 1990), as amended.[21]

---

[21] The current ACAA regulations have been in effect since May 13, 2009. *See Nondiscrimination on the Basis of Disability in Air Travel*, 73 Fed. Reg. 27614 (May 13, 2008), as modified. The DOT has amended ACAA regulations ten times since the final ACAA rule was issued in March 1990. *See* 73 Fed. Reg.

The DOT describes the ACAA regulations as "a detailed, comprehensive, national regulation, based on Federal statute, which substantially, if not completely, occupies the field of nondiscrimination on the basis of handicap in air travel." 55 Fed. Reg. at 8014. The DOT also announced that "interested parties should be on notice that there is a strong likelihood that state action on matters covered by this rule will be regarded as preempted." 55 Fed. Reg. at 8014. The Court has carefully examined Mr. Hankinson's claims and found they are preempted by federal law. Compass Airlines has been warned by the DOT that future complaints of disability discrimination against it may lead to fines or cease-and-desist orders. In direct response to Mr. Hankinson's complaint, Compass Airlines dismissed the employees involved in the October 4, 2011, and retrained its workforce. Pursuant to the Supremacy Clause of the Constitution of the United States, Article VI, § 2, federal law must supersede Montana law in this instance.

Accordingly,

IT IS HEREBY ORDERED that Intervenor Hankinson's Motion for

------

27614 n.1.

Reconsideration, Motion to Dismiss, and Motion for Summary Judgment are DENIED.

IT IS FURTHER ORDERED that Plaintiff Compass Airlines' Motion for Summary Judgment is GRANTED. The Hearings Bureau, Montana Department of Labor & Industry is hereby enjoined from exercising jurisdiction over Dustin Hankinson's Complaint of Discrimination (No. 0121015383) filed with the Montana Human Rights Bureau on February 22, 2012. Plaintiff's request for attorney fees and costs is DENIED.

DONE and DATED this 12th day of August, 2013.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE